## Case No. 32.

ACOSTA et al. v. The HALCYON.[1]

District Court, S. D. Florida. Sept. 1877.

SALVAGE—AGENCY.

[A salvor agent for the property cannot be allowed salvage, but, where he acts bona fide, may have agent's commission.]

[1 Published by permission from the MS. of Hon. James W. Locke, District Judge.]

[In admiralty. Libel by Manuel Acosta and others against the bark Halcyon and cargo for salvage. Decree for libelants.]

LOCKE, District Judge. This bark, laden with a miscellaneous cargo, bound from New York to New Orleans, went ashore on Looe Key, an exposed and dangerous shoal, about twenty miles from this port, on the morning of the seventeenth of July last, at about high water. She was boarded in the morning by libellant Acosta in the pilot boat Telegram, although at the time of his boarding her both Acosta and the master say that they considered the bark in great danger, and, as Acosta says, in his testimony, "both came to the conclusion that she would bilge." Acosta tendered the services of his vessel and crew to the master for him to come to Key West to make arrangements about storing his cargo, if any might be saved. This the master accepted, and left libellant Acosta to do what he could towards saving the property. Other vessels arrived in a short time, when the libellants commenced discharging cargo, consisting of bundles of cotton ties, and continued so doing until they had taken out some over three thousand, weighing in the aggregate about eighty six tons. When the tide was up that night, at about twelve or one o'clock, a heavy anchor having been carried out during the day, the bark was hove off, anchored, and the next day brought into this port. The reef upon which the vessel lay was of sharp coral rock, and was one of the most exposed and dangerous ones on the coast. While ashore she labored and ground on the bottom until the forward part of the keel had been nearly cut away, and the garboard streak and several planks badly worn and chafed. The salvors were engaged in the service of discharging and floating the ship about twelve hours, and worked with force and energy and all the skill and ability which the case demanded, or gave an opportunity to exhibit. The weather was good during the time, so calm in fact that the Telegram in which the master came to Key West, although having a fair wind, was from twelve o'clock noon, until after sunset in coming the distance, about twenty miles; although there was quite a swell of the sea coming in which increased her risk somewhat. The work was successfully accomplished, but there are some matters which cannot consistently be passed without comment. The vessel struck at about half-past twelve in the morning, at high water. About six the master sounded, and found fourteen feet of water, she drawing sixteen and a half when afloat. At half past twelve the next morning she was hove off.

These facts, taken together, show conclusively that, instead of its being a falling tide or even full tide when the master wrecker first boarded her, it lacked some over two hours of high water. Under these

circumstances it would be presumed that an active energetic salvor, with a sufficient vessel at his command and others near at hand, if anxious to rescue the property from the peril it was in and float the vessel from the bottom, would have endeavored to get out an anchor at once, and, if possible, float the vessel at the first high tide. But in this case it was assumed the vessel would bilge, and the procuring a safe place for storing the cargo was deemed of more importance than prompt action in her behalf. It is alleged that the vessel was in imminent peril, and that she was so considered by both master and master wrecker; as Acosta says, "He (referring to the master) and I both came to the conclusion that she would bilge." What may have been the opinion of a person at a particular time is better indicated by his conduct and acts at that time than by subsequent declarations or explanations.

I am not here to criticize the conduct of the master, only so far as it is influenced by or connected with that of the salvors; but is it to be presumed that a master whose ship was in such peril as this ship is alleged to have been in would abandon her, taking with him the only vessel present of sufficient size to render any assistance, and leave the property entrusted to his charge in the care of a stranger, while he came to a port to secure a place to store his cargo, when by enquiry he could have ascertained that ample storage could easily be secured at a moment's notice, should the result demand it? Judging therefore, from the conduct of both master and master wrecker, we must conclude that the danger to the property was by no means considered so immediate as has been represented. Upon a careful examination of the testimony, this coming to Key West may be partially, if not satisfactorily explained. Capt. Acosta says, "The master didn't ask to come down." "I asked him what would be done with the cargo, and told him about the merchants at Key West." Again, "The master did not ask for the Telegram to come to Key West." In view of this testimony it can but be concluded that he, although the master wrecker, was more anxious to secure a consignment for his owner than to rescue the property from the distress in which it was placed; and to this end was willing to sacrifice the services of a large and efficient vessel, and permit the property to remain in its perilous condition. Under these circumstances, had the vessel bilged before the high tide at which she was floated, it would have been considered such a neglect of prompt and energetic action as would have forfeited any salvage earned by the parties guilty of such laches.

The favorable circumstances of the case have, however, rendered such a severe decision unnecessary; but the facts certainly detract from the merits of the service. With this exception the service was well performed, and the vessel relieved from a considerable degree of danger. The master could not have relieved her without making a jettison of certainly as much, and probably considerably more cargo than was taken out by the salvors, and incurring the risk of longer delay which might have caused her loss. The vessel was so damaged that she has been discharged, repaired, and the cargo subjected to large expenses in the shape of labor, and wharfage and storage, which diminish the fund from which the salvage is to be paid, and will therefore diminish any salvage in that proportion. Were there no other questions connected with this case, a salvage of fifteen per cent. would under the circumstances not be unreasonable. But other matters demand our attention. F. J. Moreno, Esq., the resident agent of underwriters, has by petition, under the fifth rule of practice of this court, come in as amicus curiae, and alleges that the master of this bark has consigned his vessel and cargo to Messrs. A. F. & C. Tift, as agent, to assist him in transacting his business, they at the same time being interested in the salvage, and libellants of said vessel and cargo, and therefore prays that any salvage they might otherwise earn be refused them or diminished.

In answer to this petition it is not denied that the facts are as stated; but it is urged that a forfeiture of salvage should not follow unless fraud is alleged and proven. These pleadings, the petition and answer, are somewhat informal, the parties having appeared and submitted the matter without argument, in person, all members of the bar being otherwise engaged or unable to appear in the suit, but they are sufficient to bring the question before the court. No issue is joined, but the answer must be taken in the nature of a demurrer, or exception, to the petition. The records of the court show that A. F. & C. Tift were the owners of the Cora, Telegram, and Elida, and they do not deny the fact of agency.

The question is, whether a party interested in the salvage can legally become consignee of vessel and cargo, and thereby agent of the owners; and if he accepts such trust, what effect such accepting will have upon his claim as salvor against the property. Perhaps a brief expression of my opinion upon this question would be sufficient; but it having been undecided heretofore in this court, and as far as I can find, elsewhere, it demands an examination of the character of the question and the legal principles which determine it. When a master whose vessel has been assisted on this coast arrives in port, he is generally a stranger to the people, and, in some degree, ignorant of the new duties and responsibilities that devolve upon him through the disaster. He needs both advice and assistance. His ship is attached upon a claim of salvage, and he requires the help of

some one to enable him to properly protect the property. He is unacquainted with the proctors of the court where he is called upon to answer, and needs information to guide him in his selection. Under these circumstances he is authorized to employ some person to aid him by his advice and give him general assistance. This person so employed is not a consignee within the general meaning of the word, but an agent for general purposes for the time being; not an agent of the master only, but of the owners of the property, whoever and wherever they may be; and the relations between him and the property and its owners are influenced and controlled by the general principles of law upon the subject of agency. What these principles are has been so fully declared that no mistake can be made. Judge Marvin in an elaborate opinion upon the question of agents, their compensation. &c., in the cases of The Marathon, [Case No. 9,058,] and Scotsman, [Id. 12,515,] in this court, reviewed the subject so fully as to assist materially in deciding this point. He says: "To entitle a person to act as agent, he must have no interest in conflict with the interest of the owners of the property." "That the agent must have no interest hostile to the interests of his principal is a general principle of law. This rule is founded upon the plain and obvious consideration that the principal bargains, in the employment, for the exercise of the disinterested skill, diligence, and zeal of the agent, for his exclusive benefit." Story, Ag. §§ 210–217. "The same person cannot be agent of two contracting parties in the same transaction where their interests are in conflict, still less can he act as such where he has a personal interest in the matter adverse to that of one of the parties." Florance v. Adams, 2 Rob. (La.) 556. After citing numerous authorities, Judge Marvin says in the opinion referred to: "The law in my opinion is clear that a person entitled to a share or portion in the salvage has an interest in conflict with the interest of the owners of the property which legally disqualifies him from acting as the master's agent. If he conceal this interest from the master, such concealment the law pronounces to be a fraud; if he make it known, then the master, in the language of the supreme court, "knowingly betrays the interests of his owners." However efficient, impartial, or honest the agent may be, the law steps in and prohibits his assuming a position where his duty and interest are in conflict. Chancellor Kent says: "An agent, acting as such, cannot take upon himself an incompatible duty. He cannot have an adverse interest or employment." 2 Kent, Comm. 618; 4 Kent, Comm. 438. It is true that, in the opinion of Judge Marvin before cited, the only remedy for the wrong stated is that "a person thus having an interest in the salvage cannot earn com-

missions." But that opinion was entirely upon the question of costs, expenses, and commissions. The question of salvage was not before him. Neither of the cases under his consideration were cases of this character, and his decision cannot be accepted therefore as conclusive upon the point under examination. But it cannot be doubted what would have been his decision had the question arisen, as is plainly intimated by such positive language as the following. He says: "If he conceal his interests the law presumes a fraud, and if he makes it known the master knowingly betrays the interests of his owners." And in his work on Wrecks and Salvage (section 94) he adds to the statement that "he can earn no commissions," and, if a salvor, "he may forfeit his salvage." In the well known case of Houseman v. The North Carolina, 15 Pet. [40 U. S.] 40, the only fraud charged appeared to have been presumed from the fact that Houseman, while interested in the salvage, became an agent.

The master had a right to settle his salvage by arbitration or agreement if he considered time and expense could be saved thereby, if he did it fairly and honestly; and the question of amount of salvage, when submitted to arbitration, did not necessarily establish or even raise the presumption of fraud, but was a question of judgment, and would at the most but entail a diminution. The decision of the court plainly declares that placing the business of assisting in defending a claim for salvage in the hands of a party himself interested in "pushing it to the highest possible amount" was a fraud, and tainted the entire proceeds of the service. Judging from the language of the court in that case, there is no question in my mind what its decision would have been had the question of Houseman's interests and his peculiar relation with the property been before it unconnected with other suspicious circumstances. It is nowhere alleged that Houseman did anything improper in the matter further than accepting the agency. It is not alleged that he attempted or endeavored in any way to prevent the master's coming to Key West, or that he used any influence either in naming the arbitrators or in inducing a high rate of salvage. The question seems to have turned entirely on the presumption of fraud on account of the position occupied by him, and that the court deemed sufficient. It is not alleged that the arbitrators were either interested in the result or dishonest, nor could any court not knowing the testimony before them, or the manner in which the case was presented, declare that they had not acted in good faith.

The question of amount of salvage to be given under different circumstances is a delicate and difficult one; varying much with the condition of the case, and influenced greatly oftentimes by what might appear

under other circumstances to be trivial matters. Very seldom is the value of the cargo taken out of a vessel a limit to a salvage compensation. A slight difference in describing the course or force of the wind, or in giving the depth of water, the character of the bottom, or the time or height of the tide, the direction of a current, or the position of an anchor, make a vessel appear to have been exposed to great danger or in comparative safety; or show that the conduct of the salvors was praiseworthy and entitled to liberal reward, or that it was improper, fraudulent, and liable to censure, instead of compensation. Under a false or misstated showing of a case, an able and honest court, as well as a board of arbitrators, may be misled, and decree an exorbitant and unjust salvage. Upon this account, if on no other, the law does, and should demand and require, not only apparent good faith, but disinterested zeal, in all parties pretending in any way to represent the absent owners of the property.

This of all classes of agency should be treated with the strictest construction of law, and the positive prohibitions against any one's occupying inconsistent, incompatible, and illegal positions should be enforced. Agents of this class are appointed ex necessitate rei. The owners of the property are forced by disaster into entrusting their interests to strangers whom they are unable to meet personally, whose characters they are unacquainted with, and of whose peculiar connections or relations with the property through the same disaster they are uninformed and unaware. Certainly no proctor of this or any other court would be permitted to defend a suit in which he had a direct interest as plaintiff or libellant. And if such a position was accepted and acted upon unknown to the court, would any court, when informed of his peculiar relations to the property, give judgment in his favor as against the parties he had been representing and pretending to defend in their absence? But the relation of an agent or consignee in such a case as this is fully as confidential as that of an attorney or proctor, and if there is any difference, he stands in a more delicate position. He is the master's adviser in all things. his opinions are constantly sought and listened to, and his opportunities for influence far greater than those of a proctor or attorney. The master is under the advice and influence of the agent from the time of his arrival in port; while frequently the proctor is not seen or consulted for weeks, and then but perhaps for a short time, on special occasions and technical points. In reality the proctor is recommended and employed by the agent, and therefore is more or less directly under his influence and control.

The ease with which a plausible, agreeable and affable agent may, if so disposed. imperceptibly and without fear of detection, through constant association, satisfy a master, that the rescue of his vessel was most meritorious, that the danger in which he was placed was imminent, and that the peril was most certainly impending, so that he can listen to a highly colored and exaggerated statement of the facts of the case without perceiving their unfair character, or even upon the witness stand himself, give unintentionally a coloring to the circumstances of the disaster prejudicial to the interests of the property he represents, plainly declares that justice should interpose and protect property and absent owners from the influence of those whose interests are opposed to them. The education, life, and experience of a mariner fit him rather to combat successfully the danger of the elements than to resist the subtle influence of designing associates. The esprit de localite, the public sentiment of this community, is so strong in behalf of the salvors as against wrecked property, that the master stands especially in need of a disinterested agent. The fact that the property, from the commencement of the suit, is within the legal custody and control of the court, can in no way change or affect the confidential relations existing between the master and his agent, or the duties due from the agent to the owners of the property. The court never assumes to instruct or advise the master about defending a salvage suit, or interfere in those duties which belong particularly to the agent. The question is not whether in this case, the special consignee has not acted in good faith towards the property, and even sacrificed his own interests for its benefits and its behalf. Such questions the law does not permit to be raised, but at once declares positively against accepting the position he occupies. No matter how well I may be satisfied of the personal integrity of the parties, salvors and agents in this case, the position in which they have placed themselves compels me to accept the presumption of law under which they rest and the positive prohibition enforced by its principles. It is unnecessary to consider the matter further to decide that the principle of the law is too well established and determined to admit a doubt that a person having an interest in the salvage is legally disqualified from accepting an agency, and not only disqualified, but prohibited; and the law presumes bad faith towards the owners of the property from one accepting and holding such relation.

A positive presumption of the law admits no contradiction. and no application of equitable doctrine is requisite to establish it. In view of such a legal principle, what is the remedy? Wherever the question of commissions only has been raised. the courts have unhesitatingly declared that no commissions can be earned; because ordinarily commissions constitute the entire gain, profit or compensation of an agent. Does not the law go further and declare that all gain, profit

or compensation, in any shape or form, earned by one occupying prohibited relations to property, shall be forfeited? That one can take nothing by his own wrong? If the prayer were that all compensation to the agent in the shape of wharfage and storage as well as commissions should be refused, it would demand serious attention. The remedy must be co-equal with the wrong, and as nearly as possible sufficent to prevent it, or the law ceases to be remedial, and becomes a dead letter. The question now is how shall such a relation as is alleged and not denied, affect the question of salvage? Is the cutting off commissions a sufficient remedy, and would such a rule suffice to enforce the legal prohibition? The question of salvage is the great question pending, and on account of which the inconsistent and incompatible relations exist. A dishonest agent might willingly sacrifice what commissions might be coming to him, or indeed in many cases any compensation whatever for the privilege of influencing the question of salvage. Rules of law are established to prevent and control the acts of men interested as it were against themselves; and if they ever affect strictly honest and upright men, it is because such honest men are in positions which could be taken advantage of by dishonest ones to the injury of others without fear of detection. If the rule of presumption of fraud touches any man who would not be guilty thereof, it is only because he occupies a relation towards others in which one of less integrity might perpetrate fraud with impunity, or could be detected only with difficulty. Where there is a positive prohibition against a person's occupying inconsistent and incompatible relations, the law presumes bad faith in one who accepts such relations, and it is unnecessary to allege or prove such bad faith to subject him to legal consequences. Bad faith is only presumed where one has placed himself in a position where misconduct is most difficult to prove.

Salvage is a gratuity beyond a quantum meruit, above a compensation pro opere et labore, a tax upon commerce for the benefit of commerce, to encourage meritorious action, and requires and demands entire good faith towards the property during the entire connection with it. The law exacts "entire good faith" in every one connected with the service, and declares that a salvor, in order to entitle himself to a compensation, must come into court with clean hands. No one violating a well-established principle or rule of law can, in justice, then, demand its interposition to award him a gratuity for honest and meritorious service. "The compensation to be awarded presupposes entire good faith, meritorious service, complete restoration, and incorruptible vigilance on the part of the salvors." Salvage is declared to be a gratuity given in the interest of commerce. May it not be reasonably

declared that it would be rather for the interest of commerce that salvage should be constantly denied or refused, than that property should be placed for the purposes of defense of such a claim in the hands of those whose interest it is to increase the salvage to the highest amount? The amount of interest in the salvage of one at the same time acting as agent is the true measure of the conflict between interest and duty. By abandoning a claim for salvage at the acceptance of a consignment, no inconsistent relations are assumed; but no abandonment of the entire compensation to be earned by an agent could qualify a salvor for such position. This, being the true measure of the conflict between interest and duty, should indicate the remedy.

In the case of The Prairie Bird, [Case No. 11,365,] the question of the influence of a salvor's interest upon agency commissions was raised and briefly considered. The question of forfeiture or refusal of salvage was not raised, and although briefly considered, was not so ruled upon as to establish a precedent. The facts and circumstances in that case differed so materially from those in this that there could be no similarity of questions raised. In that case the consignment was made and the agency established before any salvage service was rendered. The agents used what means were within their power to save the property entrusted to their keeping, and thereby became entitled to a compensation. Also in The City of Houston, [Id. 2,755,] the permanent agents sent their vessels to assist the property of their principals, which was in distress from a disaster subsequent to the establishment of their agency. In neither of these cases was there any impediment in the way at the time of accepting the agency which either disqualified the party from accepting it or argued bad faith in so doing. In each of those cases the agents became salvors, if so it might be considered, or earned a meritorious agency at least, but in this case the salvors became agents. In an opinion in that case the following language was used: "There seem to be three classes of connections or relations existing between property and salvors acting as agents that may more or less affect the service rendered. First. Where the relations of principal and agent antedated the disaster, and related entirely to different matters than the saving of property, or assisting in defending a salvage cause. Second. Where the salvor has been appointed as an agent for the special purpose of saving property. And, third, where the relation of agent is accepted subsequent to the salvage service, and a part of the duties of the agency consists in advising and assisting in defending the suit.

There is no inconsistency in an agent assisting the property of his principal when in distress; but there is a palpable and de-

clared inconsistency in a party who has a salvage claim against the property becoming an agent when a part of his duty as such agent is to assist in defending the property against that very claim. There is an impropriety of conduct which, not being considered gross or willful, does not demand an entire forfeiture of salvage, but still may reduce the compensation to a quantum meruit.

A compensation pro opere et labore or quantum meruit, being determined by fixed and established limits, and not liable to vary with exaggerated statements of the case or interested influence, may frequently be given where a salvage reward would be unquestionably refused. This being the first time to my knowledge that the settlement of this question has been directly required, and it not having been alleged or shown that the conduct of the parties in this case has been in absence of the presumption of law dishonest or unfair, I shall consider this as one of that class of cases which permits a quantum meruit, and while I cannot award what can be considered a salvage compensation, will decree what may be considered a liberal compensation for the actual services rendered.

I consider that the prohibition against a person interested in a claim for salvage, accepting and occupying at the same time the position of agent, is positive, and its enforcement mandatory upon me; that one voluntarily accepting and acting in that forbidden position does it in opposition to the declared principle of the law, and forfeits any rights that he might otherwise have against the property; that if he continues to act as agent, and claim any portion of the compensation resulting from such occupation, he may reasonably be presumed to have voluntarily abandoned his rights in a claim for salvage. The law presumes bad faith towards property by his assuming to do for it that which his interests prevent him from doing fully, and such presumption of bad faith brings with it its legal consequences. A salvor accepting such relations to the property can receive nothing more than a quantum meruit for any services rendered, under the most liberal construction of his rights, and a more strict one might entirely forfeit any claim. In this case I consider five hundred ($500) dollars a liberal compensation to be decreed for the services of the "Telegram," "Cora," and "Elida." Decree will follow accordingly. Although I shall at no time shrink from enforcing the principles of the law as understood by me, let the effect be what it may, yet it is much more satisfactory to feel that such enforcement works neither hardship nor injustice to those in interest. In this case I consider that from the combined salvage and agent's service Messrs. A. F. & C. Tift are amply and fully compensated for all services rendered the vessel, although

salvage has been refused. This refusal of a salvage compensation to the owners of the "Telegram," "Cora," and "Elida" can in no way affect the other salvors either by increasing the other vessels' portions or diminishing the shares of the crews of those vessels, as no bad faith can be presumed to attach to the crew on account of the conduct of their owners.

There are still other questions which arise in the consideration of this question, among which is that of agents' commissions in the present condition of this case. Having decided, as I have, that a party accepting an agency under the circumstances is presumed to have abandoned those antagonistic interests in his claim for salvage which disqualify him from acting in such capacity, and, if not, has forfeited any rights he has under such claim, and being satisfied that the question of salvage is the true measure of the conflict between interest and duty, which, if once disposed of, leaves no objection to an agent acting and receiving full compensation for such services. I will allow the usual agency commissions. There may appear reasons for refusing commissions in this case, as all of the time he has been acting as agent he has at the same time been prosecuting a suit against the property in his charge, and has not been able as such agent to do his whole duty, but when it is once determined that under such circumstances no salvage can be earned the interest of the agent ceases at once.

In this case, although the question has not been raised, argued or considered, so as to give any decision herein the value of a precedent, the salvage having been refused, and the interest of the agent thereby disposed of, full commissions will be approved and allowed. The circumstances of a case might be such, and the relations of agent and salvor so different, as in the case of The Prairie Bird and The City of Houston, where compensation in the character of salvage is given, that in justice commissions should be denied; where there is a bona fide interest of the agent that conflicts with his duty, and yet there has been no bad faith or presumption of it in accepting the relations, and the interest is determined and decreed in the shape or character of salvage, no commissions can be earned, but in cases of this class I do not consider the law requires the enforcement of such a rule. Wherever a vessel is repaired in this port, the carpenters' bills, &c., form a proportionately large amount of the expenses upon which the consignee is entitled to his commissions; but in order for him to earn this it is necessary that he should have such a supervising interest in the contracting of the bills and keeping the time of the employees as would enable him of his own knowledge to certify to the correctness of the accounts and the necessity for the charges. It is not assumed but what a master carpenter may be as

honest, trustworthy and capable as the consignee, but the consignee is the party to whom the court or absent owners look to prove and explain all such charges as well as others; they assume the responsibilities, receive the commissions, and will be expected to be able to furnish time books and substantiate any charges made for repairs, as well as in other division of expenditures.